Oh, it's a bunch of things going on. Scott Horton v. Specialty Finishes and so on. Okay. Let's see. Thank you. So, I kind of forget how we've organized this, so you can help me. I'm going to start with the 17, the number 17 case, which is Scott Horton's Petition for Review. Okay. May it please the Court. My name is Charles Rabinowitz. I represent Scott Horton, the claimant. And as the Court knows, this Petition for Review involves the issue of how to determine an average weekly wage for an injured worker. And the purpose of an average weekly wage is to project what the injured worker would have earned had he not been hurt. And then his compensation is based on two-thirds of that, subject to maximum and minimum limits. The average weekly wage, it's well established in the courts that the average weekly wage depends on three factors. Number one, the ability to work. Number two, the willingness to work. And number three, and most important in this case, the opportunity to work. And what the administrative law judge did in this case is he ignored Scott Horton's opportunity to work at Specialty Finishes and determined the average weekly wage on his opportunity to work at Industrial Marine, which on the waterfront is referred to as And at IMI, the reason Scott Horton, he worked for that company for 13 years. And the reason he left that company is because it didn't have the work opportunity. In fact, the testimony was in the last two or three months, there was hardly any work at IMI, and Specialty Finishes was taking all of the jobs. And three workers left IMI, Lance Wilson, Ron Anderson, and Jerrell Riley, to work at Specialty Finishes. But two of them were supervisors, and one was a certified blaster, and your client was neither. Correct? No, that's not correct, completely. One of them started out as a trainee supervisor. He was paid the same amount as Scott Horton when Scott Horton started. The other one was Ron Anderson, who started out as a laborer helper and became a supervisor. The record shows his pay didn't increase until Scott Horton started working at Specialty Finishes two months later. And the third one was Jerrell Riley, who started out as a blaster, just as Scott Horton started out, was hired as a blaster. And it took him at least six months to become a certified sprayer, at least six months. And so for the first six months at least, Jerrell Riley was the same as Scott Horton. Ron Anderson was the same as Scott Horton. In fact, both of them were paid less when they started than Scott Horton was paid. And the third one, Lance Wilson, was hired as a supervisor, but didn't get any kind of a pay increase for at least until the week that Scott Horton started, and the record shows that. But the question really, at least as you frame it, and this seems to me an appropriate way to do it, is not so much what the payment per hour would have been for Mr. Horton compared to these others, but rather how much work was available, because I gather what happens in this industry is that it's very spotty. And the question was, how much work was he going to get at specialty? Correct. And actually... And he didn't work there very long, that's the problem. He worked there a week and got hurt, that's the problem. So we don't really have a record. I know he obviously went over there because he expected to get more work, but the fact finder here said, you know, I can't really say whether he would have gotten it. That's why the fact finders went back to what he had been earning at AMI. Well, the fact finder could have looked at the other people who had left AMI in the three months, in the one, two, and three months before Scott Horton did. Well, he could have, but he found that your evidence wasn't sufficient to make them comparable, correct? Exactly comparable, but for at least a month, at least one month, Ron Anderson was more than comparable. In fact, the record shows he didn't even get a pay raise until two months after he started. Jarrell Riley never became a certified sprayer, was not blaster, it was sprayer. He never became a certified sprayer for at least six months after he started, and he started in December. So the ALJ had a record that these guys had a track record after Scott Horton got hurt as to what they would have worked. What's our standard of review on, this is not a trick question, but I just can't remember, what's our standard of review by which we look at this? Well, if it's a fact question, it would be, is there substantial evidence in the record as a whole to support the findings? I think your biggest problem, counsel, is that the fact finder who made a lot of findings in favor of your client on a lot of issues said, in the absence of a comparable worker's payroll records from 2013 at specialty, the best approximation is his past earnings in the industry, and I don't see how that isn't supported by substantial evidence in the record. Well, you have to look, the law is you have to look forward. You can't take a job where he really doesn't have the work opportunity and he leaves that job because he doesn't have the work opportunity, and then base the average weekly wage on what he, on a job where he didn't have the work opportunity. When I was rehearsing for this oral argument, one of the people who was not a lawyer said to me, what if he had worked for specialty finishes for two years before and was making $60,000, $70,000, and then decided, you know, I want to smell the flowers and spend more time with my family, and I'm going to take a job where I'm not going to be working as much. So he goes to IMI, where the work is a lot less, gets hurt a week later. Would the ALJ have a basis to go back and say, I think your average weekly wage depends on the job that you just left because you didn't want to work as much, and you didn't have the opportunity to, and you had the opportunity to work a lot more? I don't think so. I mean, but counsel, the problem here is that the work is very variable. If I'm remembering the record correctly, even your client's wife testified, well, in this industry, $27,000 is a great year. No, she didn't say that. She said when he worked at IMI, $27,000 was a great year. Of course, he gets unemployment benefits, too, which is not part of the average weekly wage. But you have to look at the fact that he leaves a job to go to another job to get more work opportunities. So... Yeah, help me out on this one, because I'm not particularly influenced by the fact that these other would-be comparable workers aren't doing precisely the same job. I understand that. And they would have been paid at hourly rates that might be different, depending on what their jobs are. The question for him, then, is not, but the question for him is not whether he would have been paid the same amount. The question is, was there work available for which he would have been employed? So what do we know from these other workers as to how often they were employed? Was there, in fact, more work that they were getting at IMI, excuse me, at specialty? They were getting a lot more work at specialty. They were doubling their income, in fact, at specialty compared with what they had been making at IMI. And there was evidence that the person who was hired to take Scott Horton's place was working steadily for almost three years at the time of the hearing after Scott Horton got hurt. So the work was plentiful. There was also evidence that IMI had the same number of workers in November of 2015 that they had in January of 2013 when Scott Horton got hurt, and they were looking for 25 more workers at that time. Just as a general proposition, what's wrong with the fact finder in this kind of circumstance? Faced with the decision to compute earnings based on the job that he actually has versus a job that he might have with another employer, what's wrong with that? If he hadn't started with specialty at all, if he had gotten hurt, I don't know, over Christmas or something, before he was going to start with specialty, I'd have a tougher case. But he'd been working for specialty for a week. In fact, in the one week he worked, he worked 10 hours every single day for six days until he got hurt. He continued working. It was the seventh day that he got hurt and went to the doctor that day. So the evidence is that there was work available. He was going to be on probation for 90 days. That's in the record, isn't it? There's something to the effect that they re-evaluate the employee after 90 days. That's correct. But he wasn't considered a probationary employee. I mean, he was hired. His job title was blaster. And he had actually signed a contract with specialty to work and take all the jobs that they had for him and to learn everything. You're down to a minute. Let's hear from the other side, and you've saved some time. Thank you. May it please the Court, I'm Robert Babcock. I represent Specialty Finishes and its carrier, Signal Mutual. And from the questions and answers, I must say, I share the view that this is a question of fact finder's discretion and whether evidence supports that discretion, the exercise and the conclusion he reached. And I think that's what this case is about. But here's my problem, and you can sense it, I guess, from my questions or comments on the other side. I don't think I should care much or the fact finder should have cared much as to the amount of sort of the hourly wage that these others were making. The question is whether there was work at specialty. And it sounds as though there's a fair amount of work that was at specialty, and the fact finder looked at this case the wrong way. Well, that was kind of Mr. Rabinowitz's argument, I think, in the first couple of sentences, was he says that he... Well, it was in the last couple of sentences, too. His contention was that the administrative law judge ignored the opportunity to work as opposed to... But isn't that the question? What would he have earned had he not been hurt? And let's assume that he's going to be paid the salary that he was, you know, the hourly wage that he had. That's not disputed. The question is, if he'd not been hurt, was the work going to be there? And he'd moved over from IMI to specialty because the work at IMI was spotty. And there's some evidence in the record that there's a lot more work at specialty. But that doesn't seem to be what drove the fact finder. I think it was. I think he looked at the opportunity issue. Opportunity is... Part of that is willingness. And you can have opportunity. This was Mr. Rabinowitz's or Mr. Horton's contention, was he said, judge, don't look at the past 13 years or two years, don't average those. That's harsh. This is Section C's structure. That's harsh and unreasonable. What you need to do is look forward. And as part of looking forward, here's my evidence that would support the contention of a little over $1,000 a week wage. These guys, Wilson, Riley, and Anderson, but they not only earned more, the spread was between, over that period of time, between about $30,000 and $50,000 that they had earned during that period of the evidence, the record. Not only did they earn more, but they had more opportunity because they were certified. That's the key. Why? What is there to show that while they would have had more work, he would not have? I mean, what's the nature of the job here? I mean, they've got these ships that come in and need refinishing, and all these people do work to do the refinishing. What is there in the evidence to suggest that while these guys had the work, he wouldn't have had it? Well, first, there's very little evidence on that precise point. But that was Mr. Horton's burden. On the question of how shipyards work, the record is very incomplete. I can talk about it, but the answer is not all crafts, not all skills, have the same degree of work. Some work a short period of time intensively, others in a supervisory capacity work those So the ALJ found the hours available for employees with Mr. Horton's skills are limited. What was the evidence that supported that? What was the substantial evidence that supported that finding? There was a witness who testified about Mr. Horton, his skills, and what he was likely to earn. That Mr. Oury? That was Mr. Oury. Oh, I mispronounced it, but Oury. And his testimony was $28,000 to $30,000 a year. That's what his skills, his experience, and the absence of an intention to improve those skills. Keep in mind, Mr. Horton's skills were awfully basic in terms of shipyard work. And those have been the skills that he had maintained, apparently quite comfortably, at IMI for 13, 14 years, earning low dollars. And I think by choice, the choice not being to get additional certifications and qualifications. He would have had more opportunity had he done so. The judge found that without that, he did not improperly under Section 10c relied on the past earnings. Okay. Thank you. May it please the Court, Nathan Beard on behalf of Industrial Marine and its carrier American Equity Underwriters. I want to address three things that Mr. Horton's counsel raised about the ability to work, the willingness to work, and the opportunity to work. Mr. Horton's basis request for average weekly wage didn't have any basis to show that he had the ability to do the work for the wage that he's requesting, the willingness to work for the wage that he's requesting, or the opportunity to work for the wage that he's requesting. Mr. Auri testified that Mr. Horton, despite having blasterized But now, are we fighting about the actual hourly wage, or are we fighting about how many hours he was going to get? Either. Both? Either? Yes. The word either is different from the word both. Both. Okay. Mr. Horton was hired on as a skilled laborer in the Tanks and Voids Division, notwithstanding the fact that his pay stub said blaster on it. He never worked as a blaster for the six days, is that right? Correct. Correct. He worked tending a pot, which, I believe the record shows, is standing and watching a pot filling up full of blasting dust. Although he was injured moving a 600-pound pot. The same pot, correct. He didn't have the willingness to work. He had been offered opportunities to do other things at specialty finishes, and he turned it down. He didn't have the ability to work. He wasn't a certified blaster. He wasn't a certified sprayer. He didn't show any interest in doing blasting or spraying, except for a statement at the formal hearing that he was. It was contradicted by Mr. Auri, he said that he wasn't. And the opportunity to work wasn't there. Unlike these other employees that were doing blasting, spraying, or supervising, Mr. Horton was a skilled laborer in the Tanks and Void Division, and Mr. Auri testified that the Tanks and Void Division, in his words, wasn't very successful. And that at the time of the formal hearing, the Tanks and Void Division was doing something completely different, and not what Mr. Horton was most comfortable with. Well, one of the reasons it wasn't successful was because they had to keep redoing work, is that right? That was what was suggested, yes, that they needed folks coming from Southeast United States to do, they're the only people that know how to blast and spray, apparently, according to the witness that testified to that. In any event, the question is whether or not there was substantial evidence in the record to support the ALJ's decision. The Ryan decision provides that a court's not required to look forward to project future earnings. It may, but it doesn't have to. In this case, the only evidence presented to the ALJ to project future earnings were on workers that weren't comparable to Mr. Horton. So the ALJ took the only other evidence presented to him, which was Mr. Horton's past earnings, and calculated his average weekly wage based on that. It's not required to be perfect. It doesn't have to have mathematical precision. It's just got to be based on substantial evidence. And the ALJ's decision was so based. Okay. What about March 31st, 2014? Is that just a technical error? I believe so, Your Honor. Do both sides agree? Yeah. So you're throwing in on that one. Yeah. I think that might have been 30 days in September or April, June, and November. Yeah. That's what I thought. Yeah. Okay. Thank you, Your Honor. I think there's something that the court hopefully hasn't overlooked, but there's a Palacios versus Campbell Industries case where the ALJ did use a blend of work that didn't have as much work opportunity compared with shipyard work that Palacios took. He got hurt five weeks into a shipyard job, and the judge took a blend, the administrative law judge took a blend, and this circuit reversed and said, you have to base it on his ability to work and his willingness to work and his work opportunity at the time of the injury. And they sent it back because of that blend. In the tri-state terminals case, the Seventh Circuit case that this court cited with approval in Palacios, that was a case where the work opportunity increased substantially after the two claimants got hurt, and the first ALJ based Jesse's average weekly wage on what he had made in the past and didn't base it on the increased work opportunity at the port after he got hurt. And that really is what should have governed this case, that the judge should have said, let's forget we can't look at the past because he wasn't satisfied with that work opportunity. He was certainly willing to work, and there's no evidence that he ever turned down any jobs or ever rejected any jobs. In his application, he agreed to work at everything. He was hired as a blaster, and in the six and a half days he worked there, he worked ten hours the first six days, and until he got hurt he was working continuously. I don't know, the person starts at six in the morning and works until 4.30 in the afternoon, I don't know when he's going to have time to learn another job until there's some slack time and there wasn't when he worked there. Okay, good. Well, I think that takes care of 17-73335. So now we have another one. And the next one is 18-70089, and away we go. Robert Babcock again for Specialty Finishes and Signal Mutual. First case was about how much he gets. The first case was about the basis for his ultimate award. This case is about who pays. Who pays. That's correct. And it may or may not be your client, okay. Well, I'm arguing that my opponent's client pays, of course. It's not a substantial evidence question. This is a legal question, and one calls for review in accordance with a legal issue, which is, and the question is, to what extent should a claimant's choice of defendants affect the Longshore Act? I think that's a straightforward question before us. Counsel, has any court ever invoked the 20A presumption other than in a case brought by an employer? Is there any case that has invoked that presumption in a suit where it's one employer invoking it against another as opposed to a claimant trying to invoke it? There's such a history of this Longshore Act litigation that perhaps there is somewhere One that you're familiar with. But I'm not familiar with such a case, and I accept Sinclair's analysis that the claimant to invoke that presumption has to make a claim. I think that's what Sinclair says, and whether I think it's reasonable or not, I have to accept it. But the point is not that that's what triggers the presumption of a compensable claim. The question is, does that immunize that employer against whom a claim was not made? Our contention is that we can't trigger the presumption as another employer, but we can prove injuries with that subsequent company. And if we prove those injuries, then that subsequent company has to join in the process of resolving responsibility. And I mean, think of it this way, perhaps. Let's assume that Sinclair says, and I'm not quarreling with that, that the absence of rebut the presumption of compensability. And to get around that, we say we proved injuries at IMI that were disabling. Well, but I mean, Mr. Horton testified, I mean, this is what he said, that none of my work at IMI aggravated the injury, that it was all done when I was at specialty, it didn't do anything to aggravate it, and that's a factual finding that the ALJ made. Now, whether we would have made the same factual finding or not, that's a factual finding the ALJ made, and there was evidence to support it. But that was a factual finding if it reached that level, and it can be taken that way. It's a factual finding that was based on the idea of a misallocation of burdens of proof. A factual finding that's premised on a legal, improper legal structure. Well, what evidence is there that he actually suffered serious injury during the period when he came back to IMI? Well, that question kind of gets to the heart of a lot of this thing. I'm putting the presumption off to one side. Just tell me about the evidence that you have that say that the injury was aggravated or became genuinely serious after he left specialty. There is no evidence of a medical type saying that work at specialty caused serious physical harm. IMI didn't bring any doctor to say it didn't. We didn't bring any doctor to say it did. But that's not this court's definition, for good or for ill, about what an injury is. This court has said exacerbations, flare-ups of pain, qualify as injuries. That's a collided decision. Now, that's an extremely broad, you know, it gives an extremely broad scope to injury, but it's what the law is. I'm trying to figure out what you're telling me. Are you telling me because there's no evidence of this, there's no evidence of that, you're telling me that he wasn't injured while he was working for specialty? No. He was injured within the terms of that broad definition. He had flare-ups of pain that caused him to take— When are we talking about? For specialty? Oh, no, no. He was injured with specialty. There's no question. I think you used the wrong word. I think at one point in your argument, you said specialty, but you meant industrial murder. Oh, I'm sorry. That's okay. No, no, I think we're on the same page. So there's no question about whether he was seriously injured while he was working for specialty. He was injured at specialty. And the factual question— It debates about how serious it was. But then the factual question is, was he further injured when he went back to work for that period with IMI? That's the question. That's certainly a core question. I don't think it's the question presented by this appeal. If one accepts the idea that flare-ups of pain attributable to an earlier injury that occurred during subsequent employment qualify as injuries, that's the liberal standard that the board and this court have established. If physical harm were required, or serious physical harm, or some other term, then the burden—we couldn't have overcome it. Let me see if I can understand your argument about this flare-up. Let's say that I injure myself terribly and I've got a sore back, and if I'm just walking to Starbucks, you know, I stop and wait for the traffic light. Traffic light changes, and as soon as I start to walk, that always gives me a little twinge. Is that a flare-up in terms of your view? It's a flare-up in terms of this court's view. So, in other words, any time he goes back to work at IMI, he's got an injury, and because of that injury, sometimes he gets a little twinge. You say, well, wait a minute. That means it's IMI's responsibility? Is that where we're going? Well, the problem is that's where we've gone. Counsel, without getting into an argument with you about what the law currently says, if that were the law, no one in their right mind would ever hire an injured worker in the same field, right? Because you're going to get stuck with the whole bill as the last responsible employer if a twinge means you've got to pay. No one would ever hire the longshoreman, right? Well, that's why we have this Section 8F for second injury to encourage people to hire him. But it's not just the twinge. It's got to be a disabling twinge. Now, is there a big difference? But in this case, it was a disabling twinge that missed twinges, many of them, over a course of time that cost him time off from work. He came back, finished. And that can... And you're saying as a matter of law because the fact-finding was to the contrary. You're saying that as a matter of law, this qualified as that. The fact-finding was that there were injuries while working for IMI. Within that liberal definition of injury, which is disabling flare-ups, suffice to meet the standard. Nobody, I will say this fairly, in the longshore industry thinks much of this set of standards. But it is the ones that we have and that we've had since the Price v. Metropolitan case, now 20-some years ago. And you know, we met... Our position is we met our APA proponents' obligation by proving those injuries. That once those injuries were proven, then there should be the analysis of the substantial or the actual cost. And I think probably simultaneous, given Sinclair's distinction between disease and injury cases. But either way, both parties should have participated in that. And they did not. Thank you. For the record, Nathan Beard on behalf of Industrial Marine and American Equity Underwriters. On behalf of the appellees, I'm going to speak for 10 minutes and yield the remaining five to Mr. Rabinowitz. Industrial Marine is not the last responsible employer. Mr. Horton did not make a claim against Industrial Marine. Mr. Horton didn't say he was injured at Industrial Marine. Mr. Horton didn't testify that his back got worse while he was working at Industrial Marine. Mr. Horton testified, in fact, that the folks at Industrial Marine took care of him. Horton's attorneys are here today to argue that Industrial Marine is not the last responsible employer. The only reason Industrial Marine was a party to this action below is because specialty finishes impled Industrial Marine as the last responsible employer. The ALJ and the Benefits Review Board properly applied the law and said specialty finishes had the burden of proving its impleter case against Industrial Marine. Specifically, specialty finishes had the burden of proving that Mr. Horton's back was aggravated, accelerated, or combined with a second injury at Industrial Marine. And Mr. Horton testified his back didn't get any worse. It was about the same when he started Industrial Marine as it was – Although the facts are that he missed work because of back pain, correct? The same back pain that he had before he started working with Industrial Marine, correct. But he missed work because of back pain, and the ALJ found that some of his work exceeded the physical limitations, and he tried to work beyond his capacity. Correct.  Mr. Horton, Section 7C of the Administrative Procedure Act provides that the proponent of a rule or order has the burden of proof. There's no dispute that applies to this case, and there's no dispute that applies to longshore cases generally, and it always applies unless there's a statutory exception. There's one such exception in the Longshore Act, and that's that a claimant, by alleging that he was injured on the job with a covered employer, shifts the burden of proof to that employer only to disprove its own liability. There's no dispute Mr. Horton invoked the 28 presumption against specialty finishes. There's no dispute specialty finishes had the burden of disproving its own liability. And there's no dispute that the 28 presumption didn't apply to Industrial Marine. Nevertheless, specialty finishes maintains that there was a simultaneous burden for Industrial Marine to disprove its liability. This argument's not supported by the law. Specialty finishes was the proponent of the employer action. Specialty finishes the proponent of the last responsible employer rule. Specialty finishes had the burden of disproving its own liability under Section 20A. Industrial Marine, on the other hand, was the proponent of anything. And likewise, there's not a statute that shifted the burden of proof to Industrial Marine to disprove anything simultaneous or otherwise. The ALJ properly applied this rule as to the benefits review board and should be affirmed accordingly. And having established that they applied the law correctly, then the question becomes, well, was there substantial evidence in the record supporting the ALJ's decision that specialty finishes failed to meet that burden? And there was. Specialty finishes failed to show any evidence Mr. Horton's injury got worse. This isn't in K-LIDA, which Mr. Babcock cited, a flare-up of pain does not create an injury under the Longshore Act as a matter of law. A flare-up of pain was merely one of other factors that the ALJ was reasonable in considering and determining that, yes, the claimant had, in fact, suffered an aggravation. Of course, in K-LIDA, the employee alleged he was injured at the latter employer and there was medical evidence. Although on this record, if the claimant had actually claimed against Industrial Marine, the evidence certainly, or it appears to me, certainly would have been sufficient to sustain a claim that Industrial Marine was the last responsible employer. Not necessarily, because there still needs to be, in order for the 20A presumption to be the shift of burden of proof to Industrial Marine, Mr. Horton would have had to claim, it's more than just filing a piece of paper, he has to claim he was injured on the job and he didn't claim that. Yeah, he would have had to say, when I suffered, when I missed work periodically, it was because this aggravated my back injury. That would have been enough. Correct. And he said the reverse, it didn't. Correct. That's correct. With regard to the employer that gave him another chance, Industrial Marine, as opposed to specialty, who wouldn't hire him back. Could be. Mr. Horton's reasons, he testified that he didn't hurt his back injury because he didn't. He did testify to that. Yes. What the evidence does, so the evidence doesn't show this aggravation of pain, there's no fact the Metropolitan-Stevenson case where there's doctors coming up talking about, well, there's microscopic damage to a knee being done, this isn't like Kay Lida where there's three doctors saying that, yes, he's actually worsening because he's doing this difficult job. There's none of that in this case. There's just Mr. Horton's statement that he missed a few days of work here and there because of his back pain. But it was the same back pain that he had before he started the job and that was his testimony. So because the ALJ and Benefits Review Board correctly applied the law and because their decision was supported by substantial evidence, specialty finishes failed to meet its burden of proof and failed to show that Industrial Marine is the last responsible employer. The decisions below should be affirmed accordingly. Mr. Rabinowitz. The only thing I want to add for Charles Rabinowitz, for Scott Horton, the only thing I want to add is that in order to get the presumption, even if the law allowed a presumption, is you have to prove an injury, some type of injury. And Scott Horton didn't feel he got hurt at IMI Industrial Marine. And he never went to a doctor for anything. The insurance company signal for specialty never sent him to a doctor for a medical evaluation. It was no basis, really, for the judge to find any kind of an injury at IMI. And as this court questioned Mr. Babcock, you know, if you hurt your back and you're not supposed to lift more than 20 pounds and you take a job where you have to lift 50 pounds and then your back hurts, that just shows that you're limited. It doesn't show that you've worsened your back. You would need some medical evidence that somehow the pain was worse or somehow a doctor felt that the back, the pathology of the back was worse. But without that, there's just no injury. There's two ways of proving an injury. One is complaints, credible complaints of pain. And Mr. Horton never claimed that he hurt his back at IMI. And the second thing is medical evidence. And there was no medical evidence that he hurt his back at IMI. So for those reasons, the second injury, the second responsible employer, last responsible employer rule shouldn't even apply in this particular case. Thank you. Okay. Thank you. Thank you. Mr. Babcock. Very quickly, I think I only have about a minute or two. But the issue is how we get into this last responsible employer debate. Our act won't permit apportionment. The act, you know, among a series of employers. Last person in line picks up the whole bundle of liability. And to have that occur, to determine that, we have that last responsible employer rule. And the issue is what triggers it. And does the fact that the claimant says, hey, I'm going to go only against the company I don't like, it sounds like a plausible reason, and not go against the company I do like, does that change the rules? And we think it should not. With respect to burdens, our APA burden, I think, is set under Section 7C, we're the proponent that somebody else should be liable. Our burden is to show those injuries that trigger the responsibility analysis. We met that burden. APA doesn't have anything to do with the outcome. That's my view. Thank you. Okay. Thank all sides for the argument. Horton versus all kinds of entities submitted for decision. And we'll take a 10-minute break before we come back and hear the last two cases. Thank you.
judges: Hawkins, W. Fletcher, Bennett